# Harris *versus* Richey.

1. In cases of parol gifts or parol sales from a father to a son, there is peculiar reason why the son should be held rigidly to the proof of all those facts which courts of equity regard as equivalent to a written contract.

2. Parents habitually speak of property in possession of their children as the children's, without any intention of disclaiming their own title.

3. Contracts between parents and children must be proved by different evidence from that required between strangers. It must be direct, positive, express and unambiguous, the terms clearly defined and all the acts necessary to its validity must have especial reference to it and nothing else.

4. When a party is in possession under a claim of purchase by a parol contract, which was to be perfected by a deed, he is not protected by the Statute of Limitations.

5. Evidence of an alleged parol contract for the sale of land examined in this case.

[Harris *v.* Richey.]

November 19th 1867. Before THOMPSON, STRONG, READ and AGNEW, JJ. WOODWARD, C. J., absent.

Error to the Court of Common Pleas of *Fayette county :* No. 85, to October and November Term 1867.

This was an action of ejectment by Hunter Richey against Jonathan J. Harris, commenced May 25th 1866.

Samuel Harris derived title to the land in question on the 19th of January 1843.

The plaintiff gave in evidence an article of agreement made the 1st of March 1866, between Samuel Harris and himself, by which Harris, for $2600, agreed to convey to him the land in controversy on or before the 1st of April 1866, and proved that the defendant was in possession. He then rested.

The defendant alleged he had bought the land from Samuel Harris, who was his father, by a parol contract, payment of purchase-money, possession and improvements.

He examined Susan Harris, who resided in West Virginia. She testified that about the fall of 1846 she heard a conversation between her father and the defendant. The father asked defendant if he had any money ; he wanted some. The defendant said he had, and " would just as lief pay him the $100 owing him as not." The father said he had not the deed ready ; defendant told him to make it against his return from Virginia, where he was going next day. From a conversation between them that day (witness) understood the $100 to be paid on the land. She did not see the money paid, but gave evidence tending to prove its payment at that time. The next day the father told defendant that he would have the deed made ' for him against his return ; to which defendant replied, " very well." She further testified that before the occurrences she had spoken of, the father came to Virginia for her to go to live with him. On their road they had much conversation about the defendant's purchase of the farm known as the " Deets farm ;" he said he had three farms, and intended to will one to each of his sons ; that Jonathan should have the " Deets farm ;" that Jonathan preferred to have a deed instead of waiting for his will ; agreed to pay him $200, and had already paid him $100, and he was to make him a deed when the remainder should be paid.

Susanna John, a daughter of Samuel Harris, also residing in West Virginia, testified that she had heard many conversations between her father and defendant about the purchase of the farm, and heard her father frequently say, in and out of the defendant's presence, that the defendant " was to pay $200, and then the father was to deed it to him." In January 1847 she heard her father tell the defendant that he had paid him $200, all the purchase-money of the farm, and he would make him a deed for it. She never saw any money paid. She also heard her father say

[Harris v. Richey.]

that he wanted the defendant to pay $200 towards the purchase-money still due on the "Deets farm."

Joseph Trickett testified that in February or March 1845, the father and defendant were together to collect $100 due defendant, to pay on the Deets farm, and the father then said that when defendant paid the money due on that farm he would make him a deed for it. The father afterwards told witness that defendant had put $100 into the Deets farm, and when he made him the other payment of $100 he would make him a deed for the farm.

Samuel First, grandson of Samuel Harris, testified that in March 1862, his grandfather told him that the defendant had bought and paid him for the farm all he owed him, and he was going to make him a deed for it. He also testified that his grandfather said to defendant, in the presence of the plaintiff, that the defendant had paid him all he owed him for the farm; that he had no deed, and he, the grandfather, was going to sell it. In the same conversation he said he got more rent from the defendant than from his other two sons. He told witness that defendant had bought the farm in March 1844.

Hugh Graham testified that the defendant built a good barn on the farm; that in 1857 the father said the farm was defendant's; that he had bought and paid for it long ago.

Lewis Hagar testified that about twenty-one years before he had gone to rent the farm from the father, who told him that it was the defendant's; he had nothing to do with it; he articled with the defendant.

There was other evidence of declarations by the father that the farm was the defendant's; of valuable improvements being put on by the son; that the father, who lived about one and a-half miles distant, was there whilst the improvements were being made.

On cross-examination of defendant's witnesses, there were some of them testified that the father said: the defendant had lived there a great while on the farm, and had never paid him any rent, and was to give him one-third of what he raised; defendant said he was not to pay any rent till his father made the deed.

A brother of defendant testified that he went on the farm as tenant of defendant in 1844; was on it three years; that he went in under an agreement with both the father and the defendant; paid rent to his father, $40 one year, and the other years a share of the grain. The father was to have the rent for the interest owed by the defendant on the land.

The plaintiff in rebuttal gave in evidence a paper signed by defendant, dated January 9th 1849, directed to his father, requiring him to make him a deed as he had promised, saying, he should have a third of the proceeds of the farm, or $40 per annum while he lived, &c.

[Harris *v.* Richey.]

Also, declarations of defendant that he had let his father have $200, and had nothing to show for it, and did not expect to get the place whilst his father was living; that his father had promised to give him the land at his death, and that he would not pay any rent: that he was to give his father one-third of what he raised till his death, and then was to have the farm. There was evidence of the father hauling wood from a wood-lot, said to be part of the farm in question, but about this the evidence was indefinite and uncertain.

The court (Gilmore, P. J.), after charging the jury at some length, concluded: "The Statute of Limitations can have no bearing upon such a case; and upon full consideration of the evidence, we feel constrained to say to you that the defendant has failed to make out a title, and direct you to return a verdict for the plaintiff."

The defendant took a writ of error.

He assigned for error, that the court took the case away from the jury, and charged that the Statute of Limitations could have no bearing in such a case.

*Kaine, Playford* and *Downer*, for plaintiff in error, referred to Moore *v.* Small, 7 Harris 467; Postlethwait *v.* Frease, 7 Casey 17; Willey *v.* Day, 1 P. F. Smith 51; Richards *v.* Elwell, 12 Wright 362.

*Howell & Willson*, for defendant in error, referred to Woods *v.* Farmare, 10 Watts 204; Frye *v.* Shepler, 7 Barr 93; Brawdy *v.* Brawdy, Id. 157; Moore *v.* Small, 7 Harris 469; Rankin *v.* Simpson, Id. 472; Poorman *v.* Kilgore, 2 Casey 373; Cox *v.* Cox, Id. 383; Richards *v.* Elwell, 12 Wright 361; Greenlee *v.* Greenlee, 10 Harris 236.

The opinion of the court was delivered, January 7th 1868, by STRONG, J.—Harris, the defendant below, claimed the land under an alleged parol purchase made from his father in the spring of 1844, and the question now is, whether the proof of that purchase, of possession taken under it, and of the payment of the purchase-money, is sufficient to relieve him from the operation of the Statute of Frauds and Perjuries. In cases of parol gifts or parol sales made by a father to a son, there is peculiar reason why the latter should be held rigidly to the proof of all those facts which courts of equity have been accustomed to regard as equivalent to a written contract. All observation shows that parents habitually speak of property in the possession of their children as their children's, without any intention of disclaiming their own title. Between father and son such language is understood as it

[Harris v. Richey.]

should be, but when related before a judicial tribunal it may make
a very different impression.    To allow it to be a means of divest-
ing a parent of his estate would tend to break up that confidence
which is the charm of a family, and compel its members to treat
each other as they treat strangers.    So evident is this that it has
many times been a subject of remark in judicial decisions.    Thus
in Poorman v. Kilgore, 2 Casey 372, it was said, "the very
nature of the relation (that of parent and child) therefore requires
the contracts between parents and children to be proved by a
kind of evidence that is very different from that which may be
sufficient between strangers.    It must be direct, positive, express
and unambiguous.    The terms must be clearly defined, and all the
acts necessary for its validity must have especial reference to it
and nothing else."

Looking now to the facts of this case as they appear in the
evidence, it is remarkable that no witness was present when the
alleged parol contract was made.    The parties to it are not
brought together (except on one occasion to which we shall here-
after refer) until the years 1845, 1846 and 1847, at least one
year after the defendant took possession, according to the testi-
mony of Samuel Harris.    At best the testimony proves nothing
more than mutual acknowledgments of a previous contract, and on
no one of the occasions when the parties are proved to have been
together, was it said when the previous contract was made.    This
is left altogether uncertain.    And yet unless it was made before
April 1844, there is no proof that any possession was taken under
it.    A careful examination of what the witnesses have testified,
who testify at all respecting the acknowledgments of the parties
when together, leaves us altogether in doubt as to the precise
terms of the contract.    Susan Harris, the first witness, details a
conversation which occurred in the fall of 1846.    Then the father
asked for money, and the son expressed a willingness to pay it,
the witness understanding that it was to be paid on the land in
controversy now known as the Deets farm.    The father said he
had not the deed ready, to which the son replied that it could be
made before his return from Virginia, where he was going next
day.    On the following day the father promised to have the deed
prepared (for the Deets farm, as the witness understood it),
against the son's return from Virginia, and the son expressed his
assent.    This witness testifies nothing more of the contract.    She
speaks, it is true, of some declarations of the father, made to her
in the absence of the son, in which he spoke of his intended divi-
sion of his property by will among his three sons; that Jonathan,
the defendant, should have the farm in dispute, adding, that
Jonathan preferred to have a deed for it, and had promised to
pay $200 as purchase-money; that $100 had been paid, and that
when another $100 should be paid, he was to make a deed to him

[Harris *v.* Richey.]

for the farm. It is very obvious that in nothing that occurred when the parties were together was there any definition of the terms and conditions of the contract, or any acknowledgment when it was made.

The next witness, Susanna John, is a little more definite. She heard conversations between the parties in the years 1845, 1846 and 1847, about the purchase and sale of the farm. She heard it talked of between them that the son was to pay his father $200 for the farm, and then to get a deed. In 1847 the father told the son all the purchase-money was paid, and promised to make a deed. She does not prove that any time was mentioned when the bargain was made.

The next witness is Joseph Trickett, who proves no more than that the father in 1845 told the son when he paid the money due on the Deets farm, he would make him a deed for it. These are all the witnesses who bring the contracting parties together, except Samuel First, who testifies that on the last day of February 1866 the father admitted the defendant had paid him all he owed him for the farm, but that he had no deed for it, and therefore he was going to sell it.

In addition to this there are numerous declarations of the father made to others to the effect that the farm was Jonathan's; that he had sold it to Jonathan; that the price had been paid, &c.

This is all the evidence given to prove that a parol contract for the sale of the farm was made. If it stood alone, and there were no other questions in the case, perhaps it should have been submitted to the jury. But there is other evidence. There is no inconsiderable proof, first, that the relation of landlord and tenant was understood to exist between the parties after these acknowledgments were made; that the son acknowledged his liability to pay rent, notwithstanding the payment of the $200; at least that during the life of the father such rent was payable. If such was the fact, it is utterly inconsistent with the existence of any parol contract of sale executed. One witness says the father said, when speaking of the contract, the son had never paid him any rent; that he was to pay him one-third of what he raised, and that the defendant said he was not to pay any rent until the father made the deed. This makes the consideration for the alleged purchase altogether uncertain. Was it $200 or that sum and rent? Was the vendor to have one-third of the produce until the deed was made, or one-third of the produce during his life? The latter would seem to be probable if in connection with this testimony we consider a notice served by the defendant on the father, dated January 9th 1849, in which the father was required to come and article with the son and make the promised deed, and was told he should have one-third of the proceeds of the farm, or

[Harris *v.* Richey.]

$40 a year as long as he lived. On another occasion, in 1850 or 1851, when the defendant was told the father said he had not paid off his rent, his reply was not a denial of his liability to pay rent, but an assertion that the father owed him. Again, in 1857, when told by a witness that he, the witness, understood the defendant was paying rent for the farm, he did not claim to be an owner, but said he would not pay rent; that his father had promised to give him the farm at his death, and if he did not do that he would sue the estate; that his father had promised him the place; that he had let his father have $200, and had nothing to show for it, and did not expect to get it while his father was living. What took place at the time when the defendant took possession of the farm in 1844 is also significant. That possession was taken by a tenant. The agreement with the tenant was made by the father and the son. The rent was paid to the father during three years. Such was the agreement of the defendant. The father was to have the rent for the interest the son owed him for the land. The son said the father might have the rent if he would pay the interest of the money he, the son, had paid on the land. Yet at that time the son had paid nothing.

In view of all this evidence there is great uncertainty what the terms of the contract were; quite too much to justify its being enforced against the Statute of Frauds. Not only is the consideration of the alleged purchase doubtful, but it is doubtful whether it was understood that the father should let go his hold upon the land entirely during his life.

It is also left uncertain what land was embraced in the contract. It is said the Deets farm. But does that mean both tracts of land which were called Deets farm, the arable land and the woodland? No exclusive possession was taken of the latter. The father continued to use it after the contract as before. Yet the son claimed it. The contract as proved does not determine whether it was sold or not.

Add to this that there is no distinct proof when the contract was made, and consequently that it cannot be determined whether possession was taken under it or prior to it, and we have a case, it may be, of hardship, but one which cannot be supported against the positive provisions of the Act of Assembly.

We have only to add that the mode in which the defendant held possession of the farm, claiming it not adversely but under a parol contract of sale which he alleged was to be perfected by a deed, deprives him of any protection by the Statute of Limitations.

The judgment is affirmed.